HOLYCROSS, Appellant,

v.

STATE BOARD OF EMS, Appellee.

[Cite as *Holycross v. State Bd. of Emergency Med. Serv.*, 163 Ohio App.3d 213, 2005-Ohio-4598.]

Court of Appeals of Ohio,
Second District, Champaign County.

No. 2004–CA–22.

Decided Sept. 2, 2005.

Darrell L. Heckman, for appellant.

Michelle Stassi Rosamond, Assistant Attorney General, for appellee.

FAIN, Judge.

{¶ 1} Appellant-appellant, Nathan Holycross, appeals from an order of the trial court affirming a decision by the Ohio State Board of Emergency Medical Services revoking his license to practice as an emergency medical technician. Holycross contends that the trial court erred in holding that he had committed crimes involving moral turpitude—the board's basis for revoking his license—and that the decision violated his constitutional right to due process of law.

{¶ 2} We agree with Holycross that the board's decision to revoke his license is not supported by the probative, credible evidence in the record. We therefore reverse the judgment of the trial court and remand this cause, without reaching his constitutional claim, which we find to be moot.

I

{¶ 3} Following pleas of guilty or no contest, Holycross was convicted of telephone harassment, in violation of R.C. 2917.21(A)(1), a first-degree misdemeanor, attempted telecommunications harassment, in violation of R.C. 2923.02, a second-degree misdemeanor, and criminal trespass, in violation of R.C. 2911.21(A)(1), a fourth-degree misdemeanor. As a result of these convictions, Holycross was notified by the board that it was proposing to take disciplinary action against him and that he had the right to request a hearing. He did not request a hearing. Pursuant to *Goldman v. Ohio State Med. Bd.* (1996), 110 Ohio App.3d 124, 673 N.E.2d 677, a hearing was held before the board, but because

Holycross had not requested a hearing, he was not permitted "to present contentions, evidence, or examine witnesses appearing for and against" him.

{¶ 4} The board took evidence, found that the misdemeanor offenses of which Holycross had been convicted met "the definition of 'moral turpitude' as enumerated in *Davidson v. The State Medical Board,* No. 97 APE08–1036, 1998, Ohio App. LEXIS 2104 [ (May 7, 1998), Franklin App. No. 97APE08–1036, 1998 WL 226436] and as defined in Ohio Administrative Code Chapter 4765–1–01[ (R) ]," and permanently revoked his certificate to practice as an emergency medical technician "at any level."

{¶ 5} Holycross appealed to the Champaign County Common Pleas Court, which entered judgment affirming the decision of the board. From the judgment of the trial court, Holycross appeals to this court.

## II

{¶ 6} Holycross's first assignment of error is as follows:

{¶ 7} "The trial court erred in holding that Mr. Holycross has committed crimes involving moral turpitude."

{¶ 8} The board relied upon its finding that Holycross committed crimes of moral turpitude in deciding to revoke his license as an emergency medical technician. In its regulations, the board defines "moral turpitude" as "the act of baseness, vileness, or the depravity in private and social duties which one owes to society, contrary to accepted and customary rule of right and duty between human beings." Ohio Adm.Code 4765–1–01(R). The board argues in its brief that reviewing courts "are to give due deference to an agency's interpretation of the technical *and ethical requirements* of its own profession." (Emphasis sic.) The board cites *Pons v. Ohio State Med. Bd.* (1993), 66 Ohio St.3d 619, 614 N.E.2d 748, for this proposition. In *Pons,* a physician was disciplined for violations of R.C. 4731.22(B)(6)—"a departure from, or failure to conform, to minimal standards of care"—and R.C. 4731.22(B)(14)—"violations of medical ethics." Obviously, the Ohio State Medical Board possesses specialized knowledge and training in the areas of minimal standards of medical care and medical ethics that render it appropriate, if not absolutely necessary, for judicial officers to give at least some deference to its determinations regarding those subjects.

{¶ 9} By contrast, the discipline in the case before us was imposed upon the ground that Holycross had committed crimes of moral turpitude. These crimes did not involve Holycross's professional acts or professional skills. The board's own definition of "moral turpitude" is similar to a definition referred to approvingly in *Davidson v. State Med. Bd. of Ohio* (May 7, 1998), Franklin App. No. 97APE08–1036, 1998 WL 226436, a case the board cites in its brief. In that

definition, moral turpitude is characterized by "baseness, vileness, or the depravity in private and social duties which man owes to his fellow man, or to society in general." Significantly, the "moral turpitude" with which that case is concerned was a phrase set forth not in an administrative regulation but in the Ohio Revised Code. R.C. 4731.22(B)(13). It appears, then, that the concept of a crime of moral turpitude, unlike the concepts of minimum standards of medical care or medical ethics, which were the subject of discipline in *Pons,* supra, is not a concept that is confided exclusively, or even primarily, to the professional judgment of the Emergency Medical Services Board.

{¶ 10} Obviously, not all misdemeanors are crimes of moral turpitude. If they were, there would be no need for the limitation in the phrase "[a] misdemeanor involving moral turpitude" in Ohio Adm.Code 4765–10–03(B)(2)(c) as a basis for revoking an EMT's license. The regulation could have provided simply that any misdemeanor would provide a basis for revoking an EMT's license. Thus, although any misdemeanor offense, by definition, involves the breach of a social duty that man owes to his fellow man, or to society in general, the issue is whether the breach of duty involves baseness, vileness, or depravity.

{¶ 11} The board points out that Holycross did not seek a hearing at which he could present his own evidence, so that the evidence presented to the board was uncontested. Nevertheless, the board had evidence before it, at a hearing, and the issue is whether that evidence constitutes "reliable, probative and substantial evidence" to support the board's finding that Holycross committed misdemeanors involving moral turpitude. *In re Williams* (1991), 60 Ohio St.3d 85, 86, 573 N.E.2d 638. An appellate court in reviewing a trial court's decision of an administrative appeal uses an abuse-of-discretion standard of review. *Pons,* supra, 66 Ohio St.3d 619, 614 N.E.2d 748. Thus, it is necessary for an appellate court to give due deference to a trial court's determination whether the evidence upon which the administrative agency relies is "reliable, probative and substantial." Nevertheless, there must be some evidence in the record of the administrative proceedings to support the agency's essential findings.

{¶ 12} Otherwise, even a clearly erroneous affirmance by a trial court would have to be affirmed by the appellate court.

{¶ 13} From the record of the administrative proceedings, it is clear that Holycross became enamored of Ashley Erwin, the 15–year–old daughter of his coworker, Greg Erwin, and that Greg Erwin was upset by this, and desired to end all contact between Holycross and his daughter. The offense of attempted telecommunications harassment is described in the Champaign County Sheriff's Office report as an attempt by Holycross to send an e-mail message to Ashley

Erwin through her MSN instant messenger service. When Ashley Erwin saw that Holycross had initiated contact, she had the option to accept the message and accept Holycross on her "Buddy List" or to block him from further contact. She notified her father and blocked contact. This occurred on September 16, 2002, after Ashley's father had told Holycross not to have any further contact with her. There is no indication in the record what this attempted message consisted of, or that Ashley ever received it.

{¶ 14} We have searched the record in vain for any description of the telephone-harassment offense of which Holycross was convicted. Other than the fact that he was convicted of the offense, no facts were laid before the board concerning this offense.

{¶ 15} Without, of course, condoning either the attempted-telecommunications-harassment or telephone-harassment offenses, we find nothing in the record from which the board could find that these offenses involved the requisite baseness, vileness, or depravity to constitute crimes involving moral turpitude.

{¶ 16} Most troubling of the three offenses is the criminal-trespass offense, although, paradoxically, it is the least legally serious, being but a misdemeanor of the fourth degree. Ashley Erwin gave a written statement concerning this offense, which is worth quoting in full:

{¶ 17} "He write me notes talking about getting married. We got close over the summer and I liked to be there to talk to but he started writing letters telling him [sic] his feeling for me. He would sometimes come up to my room while I was asleep and kiss me on the cheek or forehead but then he would leave. At first, I kinda enjoyed the attention but after a while it got old and I tried to let him know to back off by telling him that dad was getting upset and he needed to stop saying stuff like we were going to get married. I also ignored him and tried to stay out of the same room as him but he kept giving me notes."

{¶ 18} The record also contains a statement, signed by Ashley Erwin, that appears to be her handwritten answers to questions written in a different hand. Some of these answers are illuminating:

{¶ 19} "Q. Did Nathan Holycross ever enter your home, at * * *, when Greg Erwin, your father was not at home? Did Nathan Holycross enter the house without being invited in?

{¶ 20} "A. Yes, a lot of times, most of the time he would knock & then would come in before you could even get to the door.

{¶ 21} " * * *

{¶ 22} "Q.    Did Nathan Holycross enter your house at * * * without permission, after your father, Greg Erwin, had notified him not to be in or around the house?   When was this?

{¶ 23} "A.   Yes, in November but I'm not for sure.

{¶ 24} "Q.   How many times did Nathan Holycross enter your home without permission?

{¶ 25} "A.   A lot of times, probably about 10–12 times.

{¶ 26} " * * *

{¶ 27} "Q.   What did you, Ashley Erwin, do when Nathan Holycross entered your home without permission?

{¶ 28} "A.   Sometimes we would just talk for a while which normally ended with a hug.   Towards January when I saw him pull in I would go to my room and pretend to be asleep.

{¶ 29} "Q.   Did you, Ashley Erwin, ever let Nathan Holycross into your home when your father, Greg Erwin, was not present?

{¶ 30} "A.   Yes, if I got to the door before he came in.   Normally he would come in on his own."

{¶ 31} The record also contains another statement from Ashley Erwin, this one contains her initialed yes-or-no answers to certain typed questions.   These pertain to an incident on September 2, 2002, in the parking lot of a church, where she came into contact with Holycross.   These answers are instructive:

{¶ 32} "Q.   Did Holycross call out to you, indicating that he wished to speak with you?

{¶ 33} "A.   Yes.

{¶ 34} "Q.   Did you initiate contact with Holycross, by approaching or calling out to him?

{¶ 35} "A.   No.

{¶ 36} "Q.   Did Holycross speak with you?

{¶ 37} "A.   Yes.

{¶ 38} "Q.   Did he suggest or speak of anything 'sexual' in nature?

{¶ 39} "A.   No.

{¶ 40} "Q.   Did he suggest further meetings with you?

{¶ 41} "A.   No.

{¶ 42} "Q.   Did you attempt to walk away, with Holycross continuing to attempt to speak with you?

{¶ 43} "A. No.

{¶ 44} "Q. What did Holycross say to you?

{¶ 45} "A. He asked about the [indecipherable] school and how things were going with it.

{¶ 46} "Q. Have you previously advised Holycross that you are not permitted to speak with him?

{¶ 47} "A. No.

{¶ 48} "Q. Have there been other instances, since Holycross was convicted of Criminal Trespass, that Holycross attempted contact with you while you were alone? If so, when and how many times?

{¶ 49} "A. No.

{¶ 50} "Q. Are you aware that your father, Greg Erwin, has advised Holycross that he is to have no contact with you?

{¶ 51} "A. Yes.

{¶ 52} "Q. Since the date of Holycross' criminal conviction for Criminal Trespass, have you attempted any contact with him without the knowledge of your parent?

{¶ 53} "A. No.

{¶ 54} "Q. On or about 16 September 2002, did you log on to MSN Messenger and find that Holycross had added you to his 'buddy list'?

{¶ 55} "A. Yes.

{¶ 56} "Q. Did the notice say that he had added you to his 'buddy list'?

{¶ 57} "A. Yes.

{¶ 58} "Q. Did the notice indicate Holycross' name?

{¶ 59} "A. Yes.

{¶ 60} "Q. Did the notice indicate Holycross' E-Mail address? If so, what was it?

{¶ 61} "A. Yes. [E-mail address listed.]

{¶ 62} "Q. Did Holycross make any contact with you via the MSN Messenger?

{¶ 63} "A. No. We blocked him.

{¶ 64} "Q. Has Holycross made contact with you by sending messages to your E-mail?

{¶ 65} "A. No.

{¶ 66} "Q. Has Holycross made contact or attempted to contact you by telephone, mail or any message since the date of his conviction for Criminal Trespass? If so, how?

{¶ 67} "A. No. He asked me for my email address after the conviction of trespass.

{¶ 68} "Q. Has Holycross' recent attempts to contact or instances of contact caused you any distress, hardship or problems at home?

{¶ 69} "A. No."

{¶ 70} We can make several conclusory observations based upon our review of the entire record of the administrative proceedings. One is that there is no allegation that Holycross ever touched an erogenous zone or did anything with Ashley Erwin more intimate or familiar than kissing her cheek and forehead while she was asleep in bed. The other is that Ashley's father, Greg Erwin, was severely distressed, if not outraged, by Holycross's contacts with his daughter after Holycross was told to stay away from her.

{¶ 71} The issue we are called upon to decide is whether it can reasonably be found, from the evidence before the board, that the criminal-trespass offense of which Holycross was convicted involved moral turpitude. In other words, did it involve baseness, vileness, or depravity? Again, this is a different question from whether the conduct was wrong; obviously, it was, and Holycross has appropriately been convicted of a criminal offense and subjected to a criminal sanction in consequence.

{¶ 72} Under other circumstances, we would be prepared to say that the unauthorized entry into the bedroom of a woman of any age, but particularly of the age of 15, followed by kissing that woman on the cheek or forehead, could be an act involving baseness, vileness, or depravity. If the perpetrator had reason to believe that his conduct would be highly offensive to the woman, we would be prepared to say that a reasonable finder of fact could find that conduct to be base, vile, and depraved, since, even though the kiss is chaste enough, the intrusion into the private sanctum of the bedroom for that purpose is likely to be so offensive to the personal security of the victim as to constitute a gross violation of one's duty to another. We hasten to add that no special relationship between perpetrator and victim would be necessary to make that finding—the unauthorized entry of a stranger into a woman's bedroom for the purpose of stealing a kiss, again, no matter how chaste, could reasonably be deemed to be likely to be so offensive to the victim's sense of personal security as to be base, vile, or depraved.

{¶ 73} In the case before us, however, all of the evidence in the record calls out for a conclusion that, unlike her father, Ashley Erwin was not likely to find

Holycross's unauthorized entry into her bedroom and kissing of her cheek or forehead to be highly offensive. It clearly appears that she was not, in fact, highly offended, even if she may have been somewhat offended. The nature of the relationship between Holycross and Ashley Erwin that clearly appears from this record belies any likelihood that she would find his conduct highly offensive.

{¶ 74} But what of the evident outrage that Holycross's conduct visited upon Greg Erwin, Ashley's father? This is perhaps the closest question in this case. We are not prepared to hold that persisting in giving one's attention to a 15–year–old girl, in the face of her father's express, and strongly voiced, disapproval is base, vile, or depraved, wrong though it may be. After all, notwithstanding the violent offense that he undoubtedly gave to Lord Capulet by persisting in pursuing Capulet's daughter, who, if memory serves, was even younger than 15, who can find it in their hearts to declare Shakespeare's Romeo vile, depraved, or base?

{¶ 75} We emphasize that in reviewing the evidence in the record, we have credited all of the evidence upon which the board could possibly rely, and have ignored contrary evidence. (Holycross told the investigating officers, for example, that he kissed Ashley Erwin while she was asleep on a downstairs couch, not in her bedroom.) Furthermore, we have given what we regard as due deference to the trial court. Nevertheless, we find no reasonable basis in the record of this administrative proceeding for a finding that the misdemeanor offenses of which Holycross was convicted involve moral turpitude.

{¶ 76} Holycross's first assignment of error is sustained.

### III

{¶ 77} Holycross's second assignment of error is as follows:

{¶ 78} "The trial court erred in upholding the decision of the State Board of Emergency Medical Services that permanently revoked Mr. Holycross' license as an emergency medical technician as such decision is a violation of due process of law."

{¶ 79} We find it unnecessary to pass upon this assignment of error in view of our disposition of Holycross's first assignment of error. His second assignment of error is overruled as moot.

### IV

{¶ 80} Holycross's first assignment of error having been sustained, and his second assignment of error having been overruled as moot, the judgment of the

trial court is reversed, and this cause is remanded for further proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

WOLFF and GRADY, JJ., concur.